**Ellen F. WHITNEY, Plaintiff,**

v.

**GREENBERG, ROSENBLATT, KULL & BITSOLI, P.C., Defendant.**

**No. CIV.A.98–40074–NMG.**

United States District Court,
D. Massachusetts.

Sept. 21, 2000.

Richard A. Mulhearn, Worcester, MA, Richard Mulhearn & Associates, Worcester, MA, for Plaintiff.

Richard C. Van Nostrand, Mirick, O'Connell, DeMaille & Lougee, Worcester, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Ellen F. Whitney ("Whitney") brings this disability discrimination action against her former employer, Greenberg, Rosenblatt, Kull & Bitsoli ("GRKB"), an accounting firm in Worcester, Massachusetts, alleging intentional violations of (1) the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12101, *et seq.* and (2) the Massachusetts anti-discrimination statute, M.G.L. c. 151B. GRKB denies that it discriminated against Whitney, claiming that it terminated her for poor performance. Pending before this Court is defendant's motion for summary judgment (Docket No. 14).

## I. Background

Whitney worked for GRKB as an executive assistant to Agnes Kull ("Kull"), the Executive Vice–President, Treasurer and Clerk of GRKB, from 1988 until December 26, 1996. Her duties included answering phones, organizing mail, typing, scheduling meetings and appointments and maintaining two to three dozen estate checkbooks. Whitney typically worked 50 hours per week but during tax season, her hours increased.

In December 1994, Whitney was diagnosed with ovarian cancer. For treatment, she underwent a hysterectomy and chemotherapy. As a result of the cancer and its treatment, she took a five-month leave of absence from work ("the first leave of absence") during which she received short-term disability payments. There has been no recurrence of the cancer subsequent to her surgery and chemotherapy.

Whitney returned to GRKB full-time on May 1, 1995 and resumed her duties. She began working overtime hours beginning in the late summer of 1995 and worked approximately 55 hours per week during the 1996 tax season.

In 1996, GRKB upgraded its computer operating system to a Windows environment. Whitney had significant difficulty learning the new system. While GRKB claims that Whitney was uncooperative in the training session and refused to learn Windows, Whitney maintains that she found the new system "very overwhelming" and "very confusing." She "could never get it" and was confused and upset because she previously had no trouble learning new computer programs.

Kull stated that Whitney was more emotional than usual, more unable to cope with work or personal problems, shorter with clients, ruder to staff, made more mistakes and was not "paying attention" after returning from her first leave of absence. Whitney's husband also noticed changes in Whitney at home after her cancer treatment, including loss of libido, trouble sleeping and failure to maintain the checkbook and other household details.

On September 10, 1996, Whitney had an anxiety attack during a routine follow-up appointment with Dr. Susan Zweizig, the oncologist who had treated Whitney's cancer. Dr. Zweizig sent Whitney on an emergency basis to Dr. Heidi Steinitz, a psychologist.

By October 31, 1996, Dr. Steinitz had determined that Whitney suffered from a cognitive impairment caused by her chemotherapy treatments. Specifically, she diagnosed her with dementia secondary to chemotherapy. The Diagnostic and Statistical Manual–IV ("DSM–IV") code for her diagnosis is 292.82, chemotherapy-induced persisting dementia.

Dr. Steinitz referred Whitney to a speech language pathologist and rehabilitation specialist, Jane Goodwin, who was to perform cognitive testing, identify areas of need and then formulate a remediation plan. Dr. Steinitz also arranged with Kull for Whitney to take a second medical leave of absence ("the second leave of absence").

Whitney returned to work from her second leave of absence on November 4, 1996, before cognitive testing had been performed. Dr. Steinitz spoke with Barbara Wyrzykowski, Whitney's Office Manager, shortly before Whitney's return to work and informed her of Whitney's diagnosis and the plan for cognitive rehabilitation. Dr. Steinitz warned her that complex new learning would be very difficult for Whitney, including learning the new computer system and stated that Whitney's emotional state had been affected by her bout with cancer, but that her inability to learn new things was definitely a physical disability.

On Whitney's first day back, Kull and Wyrzykowski conducted a review meeting with Whitney. An agenda of complaints had been prepared and Whitney was required to sign a written review, even though she had never done so before. At the review, Whitney asked whether she could work part-time for a few days to get

acclimated to work again, but Kull refused. Kull also informed Whitney that she no longer had access to the bank vault for clients' papers and securities. Kull said that she did not want an "emotionally unstable" person going into a vault that contained millions of dollars worth of securities. Kull also removed the handling of checkbooks from Whitney's duties.

On November 12, 1996, Whitney's evaluation for cognitive deficits and remediation was completed by Goodwin, who found that Whitney suffered from "mild but significant" cognitive defects in a number of areas including attention and concentration, processing complex verbal information, memory and new learning, executive functions and auditory comprehension.

Goodwin sent Kull a letter dated December 12, 1996, in which she 1) communicated her finding that Whitney suffered a cognitive deficit and 2) recommended accommodations in order to help Whitney perform her job, e.g. allowing Whitney to take notes and implementing a one-on-one approach to teach the computer system.

Dr. Stenitz later spoke with Kull and informed her that cognitive changes due to chemotherapy, not some personality defect or emotional reaction, was causing Whitney's difficulties but that the prognosis was very good for Whitney's full recovery.

GRKB also received a letter from Dr. Zweizig confirming the diagnosis of cognitive deficits secondary to treatment and stating that with appropriate support Whitney would be expected to be back "at full speed" within six months. Dr. Zweizig also recommended that Whitney be allowed to leave an hour early due to her nighttime driving problem. When Whitney later asked Kull for such an accommodation it was refused.

Kull terminated Whitney on December 26, 1996, and told her that she believed that Whitney could no longer do the job. At the termination meeting, Kull stated that tax season would be too stressful for Whitney.

Whitney obtained a temporary, full-time job at a bank within a few weeks after her termination by GRKB. Several months later, the bank converted to a Windows computer system, which Whitney had no problem mastering. After that temporary assignment ended, Whitney obtained another full-time position at a second bank performing administrative secretarial duties. She was hired as a permanent employee at that bank in September, 1998 and has been employed there ever since.

## II. Discussion

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery on file and affidavits "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

The analysis of a handicap discrimination claim under Chapter 151B is essentially the same as under the ADA, *see Grindley v. Royal Indemnity Co.*, 1996 WL 780557 at *5 (D.Mass. Nov.19, 1996), and thus, the analysis that follows applies to both claims.

■ The ADA prohibits an employer from discriminating against a qualified individual on the basis of a disability. *See* 42 U.S.C. § 12112(a). To state a cognizable cause of action under the ADA, a plaintiff must establish that he is a "qualified individual with a disability." *Id.* GRKB contends that it is entitled to summary judgment because Whitney is not disabled.

Not all physical impairments rise to the level of disability under the ADA. Rather, the term "disability" is defined as either: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment.

*See* 42 U.S.C. § 12102(2)(A)-(C).

## A. Impairment that Substantially Limits Major Life Activities

### 1. Impairment

■ "Impairment" is defined under the ADA as: (1) Any physiological disorder, or condition ... or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs [vision], ... and endocrine; or (2) Any mental or psychological disorder, such as ... organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

Whitney alleges that she is disabled on the basis of the organic cognitive deficit caused by her chemotherapy treatments. Dr. Zweizig explained the cognitive deficit suffered by Whitney as follows:

> We don't know what events transpire in the neurons or in the brain that cause this. It could be a hormonal change. Some psychotropic hormones in the brain may change. I always refer to it when I talk to patients or lay people like it's railroad tracks. Before the chemo. we are going the right way and after the chemo. we are rerouted. We actually don't know what causes it. We only know that it happens with administration of chemotherapy, and it happens probably a lot more than we think.

Whitney's cognitive deficit is a kind of organic brain syndrome. Organic brain syndrome is listed as an example of a mental or psychological disorder which constitutes an impairment under the ADA. *See* 29 C.F.R. § 1630.2(h)(2).

### 2. Major Life Activities

In addition to showing evidence of an impairment, a plaintiff must also show that the impairment substantially limited a major life activity. Major life activities "are those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. Pt. 1630.2(i), App. "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

Whitney claims a series of generalized difficulties in processing information including the following: shortened attention span, problems organizing verbal assignments, having to write things down to remember them, repeating things to "get the hang of it", missing information while transcribing dictation, difficulty tracking phone calls and difficulty keeping track of office mail. Specifically, she complains of problems learning the new computer system and driving at night. Essentially, Whitney claims that her impairment limited the major life activities of working and/or learning.

### 3. Substantially Limits

■ The Equal Employment Opportunity Commission ("EEOC") defines "substantially limits" as leaving the plaintiff: (1) unable to perform a major life activity that the average person in the general population can perform or

(2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j). To determine whether an impairment "substantially limits" a major life activity, courts assess three factors:

(i) the nature and severity of the impairment,

(ii) the duration or expected duration of the impairment and

(iii) the permanent or expected long-term impact of the impairment.

29 C.F.R. § 1630.2(j)(2).

Where the major life activity under consideration is that of working, the Supreme Court has determined that the statutory phrase "substantially limits" requires that, at a minimum, plaintiffs allege that they are unable to work in a broad class of jobs. *See Sutton v. United Air Lines*, 527 U.S. 471, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999). Reflecting that requirement, the EEOC uses the following specialized definition of the term "substantially limits" when referring to the major life activity of working:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). The mere "inability to perform a single particular job" will not suffice to establish a substantial limitation with respect to working. *Id.* The EEOC's interpretive guidance expands on this point, stating that an individual who "is unable to perform a particular job for one employer, or ... is unable to perform a specialized job" is not substantially limited in his ability to work. 29 C.F.R. Pt. 1630.2(j), App.

Whitney has presented no evidence that her deficits significantly restricted her ability to perform either a class of jobs or a broad range of jobs in various classes. To the contrary, she obtained temporary work at a bank within a few weeks of her termination from GRKB and a full-time position at a second bank after the conclusion of her temporary assignment. With the exception of the few weeks immediately following her termination from GRKB,

she has been continuously employed. She does not show that her impairment substantially limited her major life activity of working.

Likewise, Whitney has offered insufficient evidence to show that her major life activity of learning has been substantially limited. Assuming that Whitney could not learn the new computer system, there is no evidence that her learning was impaired generally. In fact, Whitney learned the Windows program at her new job with minimal training in a small group setting. Although Whitney's alleged cognitive deficits may have affected her capacity to achieve her maximum learning and work potential, there is no evidence that it substantially impaired her basic learning abilities. *See Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 155 (1st Cir.1998).

Analyzing the three general factors (i.e. severity, duration and long-term impact) set forth above, it is clear that Whitney's impairment did not "substantially limit" any other major life activity. The health professionals treating Whitney described her cognitive deficits as mild and reversible with rehabilitation. It is difficult to ascertain whether Whitney's improvement is due to the fact that she has overcome her physical deficits or to the fact that she has been able to compensate for them. Regardless, the impact of any cognitive deficit has not been debilitating. Whitney has, with the exception of the few weeks immediately following her termination, been continuously employed and she offers no evidence of any significant long-term impact. Temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are not disabilities under either Massachusetts or federal law. *See Hallgren v. Integrated Financial Corp.*, 42 Mass.App.Ct. 686, 688, 679 N.E.2d 259 (1997) (citation omitted).

In addition, the Supreme Court has held that corrective measures must be taken into account in determining whether a person is "disabled." *Sutton*, at 2142. Here, the "strategies and aids" implemented by

Whitney to overcome her cognitive deficits (e.g., the use of a phone log to track messages) enabled her to cope with her deficits and to reduce the negative impact of her impairment on her ability to function.

Because Whitney's cognitive deficit did not "substantially limit" her major life activities, she is not "disabled" under either the ADA or Chapter 151B.

### B. Record of Impairment

To have a record of an impairment, a plaintiff must have a history of, or have been misclassified as having, an impairment that substantially limited a major life activity. *See* 29 C.F.R. § 1630.2(k). Although it is clear that Whitney has a record of ovarian cancer, she does not argue that GRKB discriminated against her on that basis. Surgery and chemotherapy controlled her cancer by the time she returned to GRKB after her first leave of absence and there has been no recurrence since.

### C. Regarded As Having an Impairment

 In relevant part, EEOC regulations define "is regarded as having such an impairment" as:

> having a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

29 C.F.R. § 1630.2(*l*)(1).

Under that definition, one must be regarded as being precluded from more than one particular job. *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999) (citation omitted). At most, the evidence shows that GRKB considered Whitney to have emotional issues that made her ill-suited for a fast-paced, high-stress environment. The evidence that GRKB regarded her as such is insufficient to create a genuine issue of material fact as to whether she was regarded as being unable to perform a class of jobs utilizing her skills. *Id.* Indeed, Kull suggested to Whit-

ney that she consider seeking part-time employment close to home.

### III. Conclusion

Because Whitney fails to introduce evidence sufficient to establish that she was "disabled" under the ADA (or Chapter 151B), GRKB's motion for summary judgment will be allowed.

### ORDER

For the foregoing reasons, GRKB's motion for summary judgment (Docket No. 14) is hereby **ALLOWED.**

**So ordered.**